UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO.: 8:24-cr-285-KKM-NHA

                                                      18 U.S.C. § 371
LAWRENCE WALDMAN                                      18 U.S.C. § 1957

**INDICTMENT**

The Grand Jury charges:

**COUNT ONE**
**(Conspiracy to Violate the Anti-Kickback Statute)**

**A.    Introduction**

At all times material to this Indictment:

The Conspirators and Related Entities:

1.    Defendant LAWRENCE WALDMAN (hereinafter the DEFENDANT), who resided in Miami, Florida, was an owner and operator of Waldman Healthcare Consulting, Inc. ("WHC"), a Florida corporation with a principal place of business in Miami, Florida. WALDMAN was an authorized signer on WHC's business checking account at Financial Institution #1 ("FI-1") ending in -9068. WALDMAN was an authorized signer on personal banking accounts at FI-1, including accounts ending in -9109 and -2217.

2.    WALDMAN was also employed as a sales representative for ASAP Lab, LLC ("ASAP"), a Florida company. WALDMAN used his position with

1

ASAP to obtain illegal kickbacks and bribes for causing the submission of false and fraudulent claims for reimbursement from Medicare.

3. Individual 1, a coconspirator not charged in this Indictment, who resided in the Middle District of Florida, was the president and chief executive officer of Company 1, a purported medical consulting company that generated referrals for diagnostic testing, including genetic testing. Company 1 was a Florida corporation with a principal place of business in Jacksonville, Florida.

4. Individual 2, a coconspirator not charged in this Indictment, who resided in Cincinnati, Ohio, was a licensed physician and an enrolled Medicare provider who practiced internal medicine.

5. ASAP, was a Florida company with a principal place of business in Davie, Florida. ASAP purportedly served as a diagnostic testing laboratory. ASAP was enrolled as a Medicare provider and submitted claims to Medicare for diagnostic testing, including genetic testing.

The Medicare Program

6. The Medicare Program ("Medicare") was a federal health care benefit program that provided items and services to individuals who were (a) age 65 or older, (b) had certain disabilities, or (c) had end-stage renal disease. The benefits available under Medicare were governed by federal statutes and regulations. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

7. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), which was an agency of the United States Department of Health and Human Services ("HHS").

8. Medicare was divided into four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B covered medically necessary physician office services and outpatient care, including laboratory tests.

9. Physicians, clinics, laboratories, and other health care providers that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

10. When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, service, or item provided together with a description and the appropriate "procedure code." Additionally, claims submitted to Medicare seeking reimbursement were required to include: (i) the beneficiary's name and Health Insurance Claim Number; (ii) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (iii) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier.

11. Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area.

12. To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement. The Medicare provider enrollment application for physicians and non-physician practitioners, CMS Form 855, was required to be signed by the provider. CMS Form 855 contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to me or to the organization listed in section 4A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim, and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute . . . ). . .

13. In executing CMS Form 855, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

4

14. Medicare paid for claims only if the items and services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented to Medicare. Medicare would not pay for items and services that were procured through kickbacks and bribes.

Genetic Tests and Respiratory Tests

15. Various forms of genetic testing existed using DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain diseases or health conditions in the future. For example, Cystic Fibrosis Transmembrane Conductance Regulators ("CFTR"), and Molecular Pathology Procedure Levels One through Nine were all tests that used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain diseases or health conditions in the future. Pharmacogenetic ("PGx") testing used DNA sequencing to assess how the body's genetic makeup would affect the response to certain medications. CFTR, Molecular Pathology Procedure Levels One through Nine, and PGx, along with other genetic tests, are referred to herein collectively as "genetic testing."

16. To conduct the above-described genetic tests, a laboratory needed to obtain a DNA sample ("specimen") from the patient. Specimens were typically obtained from the patient's saliva by using a cheek swab to collect sufficient cells to provide a genetic profile. The specimen was then submitted to the laboratory to conduct a genetic test.

17. Respiratory Viral Panel ("RVP") testing detected certain respiratory viruses and bacterial pathogens. RVP tests did not test for COVID-19. Medicare reimbursement rates for the RVP test was higher than Medicare reimbursement rates for the COVID-19 test.

18. To conduct an RVP test, a laboratory needed to obtain a buccal or nasopharyngeal swab, or a respiratory sample, to collect a specimen.

19. DNA specimens and other specimens were submitted along with laboratory requisition forms that identified the patient, the patient's insurance, and the specific test to be performed. In order for laboratories to submit claims to Medicare for genetic and RVP tests, the tests had to be approved by a physician or other authorized medical professional who attested to the medical necessity of the test.

20. Medicare did not cover diagnostic testing that was not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. Except for certain statutory exceptions, Medicare did not cover examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury. Among the statutory exceptions Medicare covered were cancer screening tests such as screening mammography, colorectal cancer screening tests, screening pelvic exams, and prostate cancer screening tests.

21. If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member,

Medicare imposed additional requirements before covering the testing. In that regard, Medicare required that all diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests be ordered by the physician who was treating the beneficiary, that is, the physician who furnished a consultation or treated a beneficiary for a specific medical problem and who used the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who was treating the beneficiary were deemed not to be reasonable and necessary.

22. Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer.

### B. The Conspiracy

23. Beginning in or about March 2020, through in or about December 2022, in the Middle District of Florida and elsewhere, the defendant,

LAWRENCE WALDMAN,

did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to:

    a.    defraud the United States out of money and property and by impeding, impairing, obstructing, and defeating the lawful function of HHS, through its agency CMS, in the administration of Medicare, by deceit, craft, and trickery; and

    b.    to commit the offense of soliciting and receiving remuneration (kickbacks and bribes), in violation of 42 U.S.C. § 1320a-7b(b)(1).

### C. Manner and Means

24. The manner and means by which the DEFENDANT and his coconspirators sought to accomplish the objects of the conspiracy included, among others, the following:

    a. It was part of the conspiracy that the DEFENDANT travelled throughout the State of Florida, including to Tampa, Hilliard, and elsewhere to solicit business for ASAP.

    b. It was further part of the conspiracy that the DEFENDANT, Individual 1, Individual 2, and other coconspirators, would and did gain access to Medicare beneficiaries' insurance information and DNA specimens and other specimens through various means of solicitation, including organizing "Coronavirus Testing" events at assisted living facilities and senior centers.

    c. It was further part of the conspiracy that the coconspirators would and did offer and pay kickbacks and bribes in the form of cash payments and gift cards to Medicare beneficiaries and others who participated in free testing events.

    d. It was further part of the conspiracy that Individual 2 would and did sign laboratory requisition forms ordering medically unnecessary genetic tests and RVP tests for Medicare beneficiaries even though he was not treating the beneficiaries for cancer, symptoms of cancer, or in many instances, any other medical conditions; he did not use the test results in the treatment of the beneficiaries or the management of their care; in many instances, he did not conduct a patient visit or consultation that would justify the approval of the orders for genetic tests and

RVP tests and often never spoke with the beneficiaries; in many instances he did not obtain or review the beneficiaries medical records or otherwise evaluate their purported medical conditions; and he often did not provide the results of the genetic tests to Medicare beneficiaries.

      e.     It was further part of the conspiracy that coconspirators would and did mail laboratory requisition forms that Individual 2 signed, along with specimens, to the DEFENDANT and ASAP for the purpose of submitting and causing the submission of false and fraudulent claims to Medicare for genetic tests and RVP tests.

      f.     It was further part of the conspiracy that Individual 1 would and did offer and pay kickbacks and bribes directly and indirectly, overtly and covertly, in cash and in kind in return for specimens collected from beneficiaries and fraudulent orders for genetic tests and RVP tests signed by Individual 2, all of which were used to support false and fraudulent claims to Medicare by ASAP.

      g.     It was further part of the conspiracy that the DEFENDANT would and did obtain testing swabs collected from Medicare beneficiaries accompanied by requisition forms for genetic and RVP tests that contained forged and unauthorized signatures belonging to multiple physicians—such forms purportedly approved genetic and RVP tests for Medicare beneficiaries in Tampa and Hilliard, Florida, and elsewhere—understanding that the unauthorized forms would be used to support false and fraudulent claims for reimbursement to be submitted to Medicare.

  h. It was further part of the conspiracy that the DEFENDANT would and did receive illegal kickbacks and bribes in exchange for the false and fraudulent claims submitted by ASAP for reimbursement from Medicare.

  i. It was further part of the conspiracy that the DEFENDANT and coconspirators would and did participate in meetings, perform various acts, and make statements to accomplish the objects of the conspiracy and to conceal the conspiracy.

### D.  Overt Acts

25. In furtherance of the conspiracy, and to effect its objects, the DEFENDANT and coconspirators committed the following overt acts, among others, in the Middle District of Florida, and elsewhere:

  a. On or about March 13, 2020, the DEFENDANT caused multiple testing swabs for genetic and RVP tests to be obtained from Medicare beneficiaries residing in an assisted living facility in Tampa, Florida. These testing swabs were accompanied by requisition forms that contained unauthorized signatures.

  b. On or about May 9, 2020, the DEFENDANT, Individual 1 and Individual 2 caused multiple testing swabs for genetic and RVP tests to be obtained from Medicare beneficiaries residing in an assisted living facility in Cincinnati, Ohio. These testing swabs were accompanied by requisition forms that contained unauthorized signatures.

c. On or about July 7, 2020, the DEFENDANT and others caused multiple testing swabs for genetic and RVP tests to be obtained from Medicare beneficiaries residing in an assisted living facility in Hilliard, Florida. These testing swabs were accompanied by requisition forms that contained unauthorized signatures.

d. On or about the dates set forth below, each of which constitutes a separate overt act, the DEFENDANT received from ASAP interbank transfers of funds in the amounts specified, each of which was an illegal kickback and bribe paid for the DEFENDANT's role in facilitating and arranging for genetic and RVP testing swabs and signed requisition forms that were reimbursed by Medicare:

| Overt Act | Date | Kickback Amount |
|---|---|---|
| d.1 | March 6, 2020 | $3,000 |
| d.2 | March 12, 2020 | $5,000 |
| d.3 | March 20, 2020 | $5,000 |
| d.4 | May 4, 2020 | $2,500 |
| d.5 | May 27, 2020 | $10,000 |
| d.6 | June 10, 2020 | $40,000 |
| d.7 | June 10, 2020 | $5,000 |
| d.8 | July 3, 2020 | $20,000 |
| d.9 | July 31, 2020 | $10,000 |

| Overt Act | Date | Kickback Amount |
|---|---|---|
| d.10 | August 31, 2020 | $150,000 |
| d.11 | April 9, 2021 | $40,000 |
| d.12 | June 4, 2021 | $20,000 |

All in violation of 18 U.S.C. § 371.

## COUNTS TWO AND THREE
### (Illegal Monetary Transactions)

26. The Grand Jury realleges and incorporates the paragraphs contained in Sections A and C of Count One of this Indictment as though fully set forth herein.

27. On or about the date set forth below in each count, in the Middle District of Florida, and elsewhere, the defendant,

LAWRENCE WALDMAN,

aided and abetted by others, knowingly engaged and attempted to engage in a monetary transaction that affected interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, within the United States, that is conspiracy to solicit and receive remuneration (kickbacks and bribes), in violation of 42 U.S.C. § 1320a-7b(b)(1), in violation of 18 U.S.C. § 371, as detailed below:

| COUNT | On or About Date | Source Account/ Receiving Account | Approx. Amount |
|---|---|---|---|
| TWO | August 31, 2020 | WHC (FI-1 -9068) to DEFENDANT (FI-1 -2217) | $35,000 |
| THREE | April 9, 2021 | WHC (FI-1 -9068) to DEFENDANT (FI-1 -2217) | $39,000 |

## FORFEITURE

1. The allegations contained in Counts One through Three are incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a).

2. Upon conviction of a conspiracy to violate 42 U.S.C. § 1320a-7b(b), in violation of 18 U.S.C. § 371, the DEFENDANT shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the offense.

3. Upon conviction of money laundering, in violation of 18 U.S.C. § 1957, the DEFENDANT shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

4. The property to be forfeited includes, but is not limited to, an order of forfeiture in the amount of at least $380,000, which is the approximate amount of proceeds obtained and involved in the offenses.

5. If any of the property described above, as a result of any act or omission of the DEFENDANT:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

A TRUE BILL,

_____
Foreperson

ROGER B. HANDBERG
United States Attorney

By: _____
Tiffany E. Fields
Assistant United States Attorney

By: _____
FOR Rachelle DesVaux Bedke
Assistant United States Attorney
Economic Crimes Section

14

FORM OBD-34
June 24

No.

# UNITED STATES DISTRICT COURT
## Middle District of Florida
### Tampa Division

THE UNITED STATES OF AMERICA

vs.

LAWRENCE WALDMAN

## INDICTMENT

Violations: 18 U.S.C. § 371; 18 U.S.C. § 1957

A true bill,

███████████████

Foreperson

Filed in open court this 25th day

of June, 2024.

*Ashley Sanders*

**ASHLEY SANDERS**  Clerk

Bail $_____

GPO 863 525